Robert A. CALLAHAN and Callahan Associates, Inc., Plaintiffs-Appellants,

v.

PRINCE ALBERT PULP COMPANY LTD., Defendant-Appellee.

No. 503, Docket 77–7457.

United States Court of Appeals, Second Circuit.

Argued Jan. 12, 1978.

Decided July 20, 1978.

Richard Bennett Cooper, New York City, (Richard Bennett Cooper, P. C., New York City), for appellants.

Malcolm A. Hoffmann, New York City, (Malcolm A. Hoffmann, New York City, Edward A. Woolley, Robert W. Biggar, Jr.,

Bernard Zucker, and Craig Schiller, New York City, of counsel), for appellee.

Before GURFEIN, VAN GRAAFEILAND, Circuit Judges, and DOOLING,* District Judge.

VAN GRAAFEILAND, Circuit Judge:

Robert Callahan and Callahan Associates, Inc.,[1] appeal from a judgment entered on August 3, 1977, in the Southern District of New York after a trial without a jury. Trial was limited to the issue of liability. The district court held that appellee Prince Albert Pulp Company was not liable to Callahan, whom it employed as a sales agent, for commissions allegedly due and owing. We affirm in part and reverse in part.

Callahan is in the business of soliciting sales of wood pulp; Prince Albert manufactures bleached sulfate wood pulp. Acting without legal counsel, they entered into a sales agency agreement on December 28, 1971. The agreement, in the form of a letter from appellee's Vice President to Callahan, is set forth in the margin.[2]

During the first half of 1972, nine customers ordered trial lots. During the last half, Prince Albert signed contracts with five of them. The first three were one-year contracts with Georgia-Pacific Corporation (January 1, 1973—December 31, 1973), Finch Pruyn Company, Inc. (April 1, 1973—March 31, 1974), and Consolidated Papers, Inc. (July 1, 1973 to June 30, 1974). A one-year agreement was also made with Ward Paper Company for the 1973 year. However, on April 19, 1973, a second contract was entered into with Ward which ran from January 1, 1974, to December 31, 1977, and continued thereafter subject to termination by either party on one year's notice. The fifth contract was with Blandin Paper Company. It ran from January 1, 1973, to December 31, 1975, and continued thereaft-

---

* Hon. John F. Dooling, Senior District Judge of the United States District Court for the Eastern District of New York, sitting by designation.

1. Although this litigation was commenced by Robert Callahan alone, Callahan Associates, Inc., intervened as an additional party plaintiff, asserting that Callahan was in its employ during part of the period in issue and that it might be entitled to some or all of Callahan's recovery. For convenience of discussion only, we will refer to Robert Callahan as the plaintiff-appellant. The district court upon remand will determine the nature and extent of the intervening plaintiff's rights, if any.

2. This letter will confirm the arrangements made.

1. We authorize you to act as our exclusive sales representative for Prince Albert bleached sulphate pulp for the clients on the attached list.

2. This arrangement is for a trial period of six months, i. e., January 1st, 1972—June 31st, 1972.

3. During this period, you are authorized to submit contracts on behalf of Prince Albert to the clients on the attached list. The price and conditions of each of these contracts is, in each case, to be approved by us.

4. It is understood that you will follow strictly the price and sales policy of Prince Albert and that all orders are subject to final acceptance by our office.

5. If the clients place contracts with us during this period we are willing to extend your exclusive representation for a period of three years, i. e., to December 31st, 1975.

6. For clients who may only order trial lots during the first period of six months, your sales representation will be extended until December 31st, 1972, and would be extended to December 31st, 1975, provided clients, during the second six months, conclude a contract with our organization.

7. You will receive a commission of 2% on the FOB mill net proceeds of a minimum of $2.00 per ton. Payment of this commission will be made after the end of each month for the amount actually· received from the customers for payment of their invoices after all deductions during the preceding months.

8. All confirmations, invoicing, collections, etc., will be done by Prince Albert Mill.

9. You are to keep regular contact with the customer and advise of any tonnages, changes or special instructions etc. You will receive copies of order confirmations and invoices.

10. You will prepare a Call Report on all calls made to the customers on our behalf and submit such report within one week after call.

11. It is expressly understood that you are not to offer any other Canadian softwood kraft paper pulp but Prince Albert's to any of the buyers on the attached list.

12. This agreement terminates in case of your incapacity or death. On contracts made before such an event, we agree to pay to your Estate one half of the commission due under this Agreement.

er subject to termination by either party on one year's notice.

Although each of the contracts provided that the buyer would purchase a specified quantity of pulp over a given period, it appears to have been the custom in the trade that these were not treated as firm commitments but rather as options to purchase. For example, in 1976, Ward took delivery on only 26% of the quantity for which it had contracted. Other customers were shipped as little as 18%, 31%, 33% and 42%. Price changes and/or discounts were negotiated quarterly, and failure to agree could result in termination of the contract.[3] A defense witness described the agreements as "reservation" contracts which are negotiated every quarter at the seller's announced price. Another witness testified that during 1976 only 10% of the world's pulp buyers took their entire contract quantity. Callahan's contract provided that commissions were to be paid him only after payments for deliveries had been made.

In January 1972, when the agreement between plaintiff and defendant was effected, there was a buyer's market in pulp. However, within a year thereafter, this changed to a seller's market, and the demand for pulp exceeded the supply. Between 1973 and 1975, the market price rose from $160 a ton to $367 a ton. Because of this price increase, Callahan's commissions per ton more than doubled. At the same time, his job as a salesman became markedly less demanding. Customers were begging for pulp. Prince Albert requested therefore that Callahan reduce his commissions.[4] Upon his refusal to do so, Prince Albert decided to dispense with his services at the conclusion of his contract.

■ Callahan's first claim against Prince Albert was for alleged loss of commissions arising out of Prince Albert's refusal to enter into new contracts with four of his customers at the termination of their existing ones. Callahan contends that appellant's refusal was based on a desire to avoid paying him commissions. The district court correctly held that a salesman's right to commissions can not be defeated by his employer's arbitrary refusal to accept orders which he has procured. *See Nat Nal Service Stations, Inc. v. Wolf,* 304 N.Y. 332, 339–40, 107 N.E.2d 473 (1952). On the other hand, the employer need not abdicate its own business judgment and is not required to enter into contracts which will be unprofitable or contrary to its own business interests. *See Friede v. White Co.,* 244 F. 272, 274 (S.D.N.Y.1917). Applying these tests, the district court found the defendant was not liable for failing to enter into any new contracts with plaintiff's customers.

■ With regard to three of them, Georgia-Pacific, Finch Pruyn and Blandin, the district court's findings are supported by the record. When the market switched to one of short supply, appellee wished to use its limited resources in satisfying its customers with whom it had or could expect to have long term relations. It wanted customers upon whom it could rely in good times and bad. Georgia-Pacific was an integrated mill, *i. e.,* one which both manufactured and consumed pulp. It was in and out of the market as purchaser and could not be depended upon for long-term loyalty. Finch Pruyn was in a poor freight area for trading with appellee. Appellee's witnesses testified repeatedly and unequivocally that appellee's decision not to enter into new contracts with Georgia-Pacific and Finch Pruyn was not related in any way to Callahan's right to commissions.

■ Prince Albert did sign renewal contracts with Blandin and Ward, the first of

---

**3.** Each contract also contained a provision that the obligation of either the seller or the buyer could be reduced by reason of force majeure or by reason of construction delays, operating difficulties or any other cause beyond its control.

**4.** On September 24, 1973, the company advised Callahan that "because of the dramatically different circumstances which prevail today compared to those prevailing at the time we made our agreement, we feel the commissions which would be due are excessive. This basic feeling will probably continue to worry us and will certainly tend to delete our enthusiasm about renewing contracts with customers on your list . . . ."

which ran until the end of Callahan's contract term and the second of which ran beyond it. Some discussions were had concerning a possible third contract with Blandin for a period beginning in 1976, but, as the district court found, "nothing concrete was settled upon." Prince Albert's only contact with Blandin was through Callahan, and Prince Albert was reluctant to enter into an agreement commencing after its association with Callahan had been terminated. Callahan had a close personal friendship with the president of Blandin, and Prince Albert was concerned that after Callahan left its employ he might take Blandin with him. Prince Albert felt that Callahan's influence over Blandin made a business relationship with Blandin a bad long-term risk. The district court found that this was a valid business reason for not continuing Blandin as a customer. Appellee's witnesses also testified that it was contrary to firm policy to enter into long-term contracts and that they did not have sufficient available pulp to undertake any such arrangement with Blandin. Finally, there was never a definite and firm contract proposal submitted on behalf of Blandin upon which a claim for commissions could reasonably be based. We need not reach the question whether Callahan's influence over Blandin, standing alone, could be considered a valid business reason for Prince Albert's decision to terminate its dealings with Blandin. Under the totality of circumstances outlined above, we cannot say that the district court erred in rejecting Callahan's contention that termination was improper.

█ With regard to Consolidated, however, the situation is different. Callahan did submit to Prince Albert a proposed written contract running from July 1, 1974, to December 31, 1977, and continuing thereafter unless terminated on one year's notice. This called for annual purchases of 4800 tons, taken in approximately equal monthly installments. Appellee's Vice President indicated that, in principle, the company was "enthusiastic about making this long-term arrangement with this excellent company" but would not commit itself until the situation concerning its future supply of tonnage was clarified. Despite this enthusiasm, appellee thereafter refused to consummate any contract with Consolidated unless Callahan released his commissions after 1975. We conclude that the details of this proposed contract were sufficiently definite to support a claim for lost commissions. We conclude also that, in refusing to consummate the proposed deal, appellee was motivated, not by business judgment, but by the desire to deprive Callahan of commissions for post-1975 sales.

█ We hold therefore that Callahan is entitled to recover lost commissions based upon the proposed contract with Consolidated which is Exhibit 73 in evidence and remand to the district court for an appropriate computation of damages. In making this computation, the district court should determine upon appropriate proof what portion of the 4800 tons per annum would with reasonable probability have been called for and delivered during the three and one-half year contract term. *Hedeman v. Fairbanks, Morse & Co.*, 286 N.Y. 240, 250, 36 N.E.2d 129 (1941). The district court should also make allowance for the non-contract deliveries actually made by Prince Albert to Consolidated between July 1, 1974, and December 31, 1977, and for any commissions on such deliveries already paid to Callahan.

█ Callahan's second claim arises from Prince Albert's reduction of contract tonnage to Callahan's customers during 1973 and 1974 as a result of the pulp shortage. Relying upon the force majeure clause in its contracts, Prince Albert reduced tonnage by some 8% in 1973 and 16% in 1974. Substantially similar reductions were made with regard to Prince Albert's other contract customers. At the same time, however, Prince Albert took on some new customers and voluntarily increased delivery of tonnage to others. To the extent that this occurred, Prince Albert was not entitled to rely on force majeure in curtailing shipments to its contract customers. Callahan therefore sustained damages in lost com-

missions because his customers did not receive all of the shipments which they requested and to which they were entitled.

We remand this issue also to the district court for a determination as to the quantity of deliveries voluntarily made by Prince Albert to non-contract or new customers or in excess of existing contract requirements during 1973 and 1974. The total amount of such voluntary deliveries should then be apportioned theoretically and ratably among all of Prince Albert's contract customers, who did not benefit from its largesse. If Callahan can establish that his customers were denied delivery of all or part of the increased tonnage that should have been allocated to them, he is entitled to be paid a commission thereon.

■ Callahan's final claim arises out of a misunderstanding between the parties as to the termination date of Callahan's agency agreement. Prince Albert mistakenly believed that the date of December 31, 1975, was placed in the agreement through typographical error and that the correct date should have been December 31, 1974. This claim was abandoned during the trial, and Prince Albert paid Callahan the 1975 commissions to which he was entitled. During 1975, neither Blandin nor Ward ordered the full amount of pulp to which it was entitled under its contract. Callahan asserts that this may have resulted from Prince Albert's mistaken position concerning the termination date of his agency contract. We find no merit in this contention. Both Blandin and Ward had the contractual right to call for specified tonnages during 1975 regardless of the status of Callahan's agency agreement. Their election not to exercise this right does not entitle Callahan to recover for his resultant loss in commissions.

The judgment appealed from is affirmed in all respects except as set forth above and is remanded to the district court for further proceedings in accordance with this opinion. Costs of appeal are awarded to appellants.